Argued and submitted October 10, 1990, judgment affirmed as to convictions for aggravated murder, felony murder, and robbery in the first degree; sentence of death vacated and remanded to circuit court for further proceedings April 4, 1991

STATE OF OREGON,
*Respondent,*

*v.*

TYRONE EARL WALTON,
*Appellant.*

(CC C8708-34157; SC S35078)

809 P2d 81

David K. Allen, Portland, argued the cause and filed the brief for appellant.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, Cynthia A. Carter, Jonathan H. Fussner, Vera Langer, Janet A. Metcalf, and Douglas F. Zier, Assistant Attorneys General, Salem.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

This is an automatic and direct review of a judgment of conviction of aggravated murder and sentence of death. *Former* ORS 163.150(1)(f) (1987) (now ORS 163.150(1)(g)). Defendant seeks reversal of his conviction of aggravated murder. Alternatively, he requests this court to vacate his sentence of death. He also seeks reversal of his convictions of felony murder and robbery in the first degree.[1] We affirm defendant's convictions. We vacate his sentence of death and remand this case to the circuit court for further proceedings consistent with this opinion.

### SUMMARY OF FACTS

The jury found defendant guilty. Therefore, we view the evidence in the light most favorable to the state. *State v. King,* 307 Or 332, 339, 768 P2d 391 (1989).

The crimes that defendant was convicted of committing in this case occurred on June 22, 1987. At trial, however, the state presented evidence of several events that occurred both before and after that date. Therefore, we summarize the entire course of events in chronological order.

On May 16, 1987, defendant and Jolene Abbott went to a Minit Mart convenience store at Southeast 39th and Yamhill Streets in Portland. Defendant was wearing a cap to disguise a distinctive half-moon scar on his forehead. Armed with a sawed-off shotgun, defendant robbed the Minit Mart. At trial, Abbott identified State's Exhibit #14 as the sawed-off shotgun that defendant had used while robbing the Minit Mart on May 16.

Early in June, 1987, defendant and Marion Tillman drove to two convenience stores in the Beaverton area. Defendant told Tillman that one of the stores would be "a good lick." Tillman understood that to mean the store would be a good target for stealing money. Defendant and Tillman then returned to his house. Defendant went inside and returned

---

[1] ORAP 12.10(2) provides:

"If, in addition to a conviction for aggravated murder forming the basis for the death sentence, a defendant is convicted of one or more charges arising from the same charging instrument, the Supreme Court shall have jurisdiction to review any such conviction without the filing of a notice of appeal."

with a sawed-off shotgun, which he showed to Tillman, and asked, "Do you think [this] will scare somebody?" At trial, Tillman identified State's Exhibit #14 as the sawed-off shotgun that defendant had shown her early in June.

A few days later in June, 1987, defendant asked Tillman to drive him to a Plaid Pantry store at North Killingsworth and Denver Streets in Portland. Although at first she agreed, Tillman later changed her mind because she "didn't want to be involved." After being arrested on the instant charges, defendant telephoned Tillman several times and suggested that she fail to appear at his trial, or that she change her testimony.

After those events with Tillman, in June, 1987, defendant and Abbott rented a car in Portland to drive to Colorado. They returned to Portland on June 20 and spent June 21 engaged in shoplifting, selling the proceeds of their thefts to obtain money, and using the money to buy cocaine, which they then used.

Early on June 22, their rental car was vandalized. Defendant and Abbott decided on a likely suspect for the vandalism, returned to defendant's mother's house, obtained the sawed-off shotgun (State's Exhibit #14), then drove around until they found the suspect and threatened him. Later, defendant, Abbott, and their friend, Marcia Harris, attempted to recontact the suspect, failed, and returned to defendant's mother's house to consume more cocaine.

Having spent all their money, defendant and Abbott decided that they needed more money to buy more cocaine. At about 8:00 a.m. on June 22, Abbott drove defendant in the rental car to the Plaid Pantry convenience store at North Killingsworth and Denver Streets. He was wearing a blue baseball cap, a black sweatshirt, black jeans, and tennis shoes. Defendant got out of the car carrying the sawed-off shotgun in a bag. He told Abbott to keep the motor running and went into the store. While sitting in the car, Abbott heard a shot. Defendant came out of the store, sticking the sawed-off shotgun back into the bag. Abbott asked defendant whether he had shot somebody. Defendant answered that he had shot the Plaid Pantry clerk because "the man was stepping from the counter like he was going to go step on an alarm or something."

Minutes later, the Plaid Pantry clerk was found dead beneath the store's open cash register. The cause of death was shotgun wounds to the chest and heart. An audit of the Plaid Pantry cash register showed a shortage of $79.00. Witnesses to the Plaid Pantry incident described the suspect as a slender, young, black male wearing a cap and dark jogging clothes. A witness saw a car, matching the description of the car that defendant and Abbott had rented, leaving the scene.

Defendant and Abbott then returned to his house. At defendant's request, Abbott hid the sawed-off shotgun in the neighborhood. Unknown to defendant, Abbott also hid defendant's blue baseball cap under the dining room couch at defendant's mother's house. She hid the cap, believing that defendant would be less likely to commit more robberies if he could not find the cap because he needed it to cover the distinctive half-moon scar on his forehead.

Next, defendant gave money in small bills to Harris and told her to buy more cocaine. Harris left with the money and returned with cocaine, which defendant, Abbott, and Harris then consumed. The following day, defendant and Abbott returned the rental car.

Detective Law, who was assigned to investigate the Plaid Pantry murder and robbery, interviewed several persons, including Abbott. As a result of information that he obtained from them, Law searched for and found the sawed-off shotgun where Abbott said she had hidden it on June 22.

On August 7, 1987, Law obtained a warrant for defendant's arrest. Thereafter, Law and Detective Nelson drove to a house on Northeast Mallory Avenue, where defendant was then living with Marcia Harris. The detectives saw defendant standing in front of the house talking to Harris. Law addressed defendant by his name, Tyrone Walton. Defendant responded by saying that that was not his name and that his name was Ronnie Martin. Law had a photograph of defendant, and he told defendant that he knew who defendant was. Law then told defendant that he was looking for Abbott. Defendant denied knowing her.

Law asked defendant whether the detectives could talk with him. Defendant agreed, and he invited the

detectives to the front porch of the house. A wide-ranging discussion followed, during which Law asked defendant about his possession of a sawed-off shotgun. Defendant denied possessing a sawed-off shotgun. Law showed defendant State's Exhibit #14. Defendant denied having seen it before. Law asked defendant about his possession of a rental car matching the description of the Plaid Pantry getaway car. Defendant denied possessing a rental car. Law asked defendant whether he had ever telephoned "911" to implicate Abbott in the Plaid Pantry crimes. Defendant denied telephoning "911." Law asked defendant if he would go to the police station voluntarily to clear up questions about whether he had called "911" to implicate Abbott in the Plaid Pantry crimes. Defendant agreed to do so.

At the police station, defendant was advised of his *Miranda* rights, which he said he understood and was willing to waive. He agreed to talk with the detectives. During the interview, defendant admitted that he knew Abbott and that he had lived with her, but he stated that she had moved from their house weeks earlier and that he had not seen her for several days. He admitted that on July 28, 1987, he had telephoned "911" to implicate Abbott in the Plaid Pantry crimes. He explained that he had done so because he was angry with Abbott for moving from their house and terminating their relationship. He stated that the information he had given to "911" was untrue. He acknowledged knowing Marion Tillman but denied having talked to her about any robbery. He denied owning or wearing a cap, denied possessing a sawed-off shotgun, denied having seen State's Exhibit #14, and denied possessing a rental car.

Law then attempted to question defendant about the May 16, 1987, Minit Mart convenience store robbery. Defendant responded that he did not want to say any more, and the interview was terminated. Defendant was taken to an elevator for transfer to the jail intake section. As he got on the elevator, defendant spontaneously asked Law what he was being charged with. Law answered that defendant was being charged with first degree robbery and aggravated murder. Defendant then exclaimed, "You got me on the first one, but you can't prove the other one." When Law asked defendant

what he meant by "the first one," defendant answered, "the robbery."[2]

Defendant was charged with two counts of aggravated murder (personal and intentional murder committed in the course of and in furtherance of robbery in the first degree; and murder committed in an effort to conceal the identity of the perpetrator of a crime); one count of felony murder; and one count of robbery in the first degree. A jury returned a unanimous verdict of guilty on all four counts. In the penalty phase, the jury answered "yes" to the three questions posed by *former* ORS 163.150(2). Thereafter, the trial court entered a judgment of conviction and sentence of death.

## ASSIGNMENTS OF ERROR

### A. GUILT PHASE

#### *Pre-Miranda Statements*

Defendant contends that the trial court erred in denying his pretrial motion to suppress statements that he made to the police before he was advised of his *Miranda* rights.[3] He argues that he was in custody from the moment the detectives first contacted him on August 7, that he was not immediately advised of his rights, and that his pre-*Miranda* statements were obtained by a ruse designed to prolong his interrogation by keeping him ignorant of Detective Law's possession of an arrest warrant and Law's unequivocal intent

---

[2] The trial court interpreted defendant's answer to be an admission that he had robbed the Minit Mart store on May 16.

[3] The only portion of defendant's pre-*Miranda* statements offered by the state at trial was Law's testimony:

"Q. [PROSECUTOR]: [Detective Law] would you tell the jury please, then, who you were with, what you observed, what you said, and what happened?

"A. Okay. Detective Nelson and I went to that location and I observed Mr. Walton standing in front on the sidewalk, in front of 5115 Northeast Mallory. Marcia Harris was in the car that was parked, and I believe the engine was running. It looked like she was preparing to leave. I identified myself and approached Mr. Walton, called him by his name, and he indicated —

"Q. [PROSECUTOR] Now, when you say, 'By his name' —

"A. I called him Tyrone Walton, and he told me that Tyrone Walton was not his name and that his name was Ronnie Martin. I asked him if he knew Jolene Abbott and he stated that he did not know her. And he then looked at Marcia Harris and asked her if she knew Jolene Abbott and that she shook her head no indicating she didn't know who Jolene Abbott was either."

to arrest him. Defendant argues that both the state and federal constitutions require suppression of his statements. The state argues, *inter alia,* that the error, if any, in admitting defendant's pre-*Miranda* statements was harmless beyond a reasonable doubt. For the reasons explained below, we agree with the state.

In *State v. Isom,* 306 Or 587, 595-96, 761 P2d 524 (1988), this court stated the rule for testing harmless error under the Oregon Constitution:

"Under Oregon law, a verdict against a criminal defendant may be affirmed notwithstanding trial error if the error did not affect a 'substantial right' of the defendant. OEC 103(1). This court has interpreted this to mean that the verdict may be affirmed if there is 'little likelihood that the error affected the verdict.' *State v. Hansen,* 304 Or 169, 180-81, 743 P2d 157 (1987); *see also State v. Miller,* 300 Or 203, 220-22, 709 P2d 225 (1985)."

In *State v. Miller,* 300 Or 203, 220-21, 709 P2d 225 (1985), *cert den* 475 US 1141 (1986), this court stated:

"OEC 103(1) provides: 'Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.' According to the Legislative Commentary to OEC 103(1), appellate courts are required to affirm the trial court, notwithstanding evidential error, whenever there is: (1) substantial and convincing evidence of guilt in a criminal case, and (2) little, if any, likelihood that the error affected the verdict. * * * We have so held in *State v. Mains,* 295 Or 640, 669 P2d 1112 (1983). This test is consistent with the standards for prejudicial error set forth in Article VII (Amended), section 3, of the Oregon Constitution and interpreted in such prior cases as *State v. Naylor,* 291 Or 191, 629 P2d 1308 (1981); *State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973); and *State v. McLean,* 255 Or 464, 468 P2d 521 (1970)." (Footnote omitted.)

*See State v. Affeld,* 307 Or 125, 128, 764 P2d 220 (1988) (Article VII (Amended), section 3, of the Oregon Constitution requires this court to affirm judgments of lower courts even if error was committed if we conclude that the judgment achieved the correct result); *State v. Hansen,* 304 Or 169, 180, 743 P2d 157 (1987) (a substantial right of a criminal defendant is not affected if there is substantial and convincing

evidence of guilt and little likelihood that the error affected the verdict).

■ A different rule applies if the error is a violation of the federal constitution. In that case, before the error may be found harmless, the state must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt." *Chapman v. California,* 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705, *reh'g den* 386 US 987 (1967); *see Rose v. Clark,* 478 US 570, 576, 106 S Ct 3101, 92 L Ed 2d 460 (1986) (an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt).[4]

The pre-*Miranda* statements that defendant challenged at trial were his initial denial that he knew Abbott, his denial of his true name, and his assertion that his name was Ronnie Martin. Although those statements were false, in his post-*Miranda* statements, which also were admitted in evidence and are not challenged here, defendant admitted his true name and admitted that he knew Abbott.

Even if the trial court erred in denying defendant's pretrial motion, a question that we do not decide, we conclude that there is substantial and convincing evidence of defendant's guilt in the record as a whole and little, if any, likelihood that this error affected the jury's verdict. We, therefore, hold that the error, if any, was harmless. *State v. Isom, supra; State v. Miller, supra.* We further hold that the error, if any, was harmless beyond a reasonable doubt. *Chapman v. California, supra.*

---

[4] The United States Supreme Court has emphasized that while there are some errors to which the harmless error rule does not apply, they are the exception and not the rule. *See Arizona v. Fulminante,* ____ US ____, 111 S Ct 1246, 113 L Ed 2d 302 (1991) (harmless error rule is applicable to the admission of involuntary confessions); *Rose v. Clark,* 478 US 570, 578-79, 106 S Ct 3101, 92 L Ed 2d 460 (1986); *Rushen v. Spain,* 464 US 114, 117 n 2, 104 S Ct 453, 78 L Ed 2d 267 (1983), *reh'g den* 465 US 1055 (1984) (most constitutional rights are subject to harmless error analysis).

*Other Crimes Evidence*

Defendant contends that the trial court erred in admitting evidence that he robbed the Minit Mart convenience store on May 16, 1987. The state offered the evidence to prove defendant's identity as the perpetrator of the Plaid Pantry crimes and that he had possessed the same sawed-off shotgun (State's Exhibit #14) several weeks before those crimes were committed. Defendant argues that the evidence was inadmissible propensity evidence under OEC 404(3)[5] and that, even if relevant for the reasons asserted by the state, the evidence should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. OEC 403.[6] We review the decision to admit or exclude the evidence for an abuse of discretion. *State v. Moen,* 309 Or 45, 70, 786 P2d 111 (1990).

Under OEC 404(3), evidence of other crimes may be admissible for any relevant purpose other than to show that a person had a propensity to act in accordance with his or her character. *State v. Pinnell,* 311 Or 98, 105, 806 P2d 110 (1991); *State v. Johns,* 301 Or 535, 548-49, 725 P2d 312 (1986). Whether other crimes evidence is relevant for a purpose other than to show such a propensity is a question of logical relevance for the trial court under OEC 104(1).[7] *State v. Pinnell, supra,* 311 Or at 109 n 17. Other crimes evidence is logically relevant if it "even slightly increases or decreases the probability of existence of any material fact in issue[.]" *State v. Allen,* 301 Or 569, 573, 725 P2d 331 (1986).

---

[5] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[6] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[7] OEC 104(1) provides in part:

"Preliminary questions concerning the * * * admissibility of evidence shall be determined by the court[.]"

*See State v. Carlson,* 311 Or 201, 208, 808 P2d 1002 (1991) (for discussion of OEC 104).

■     The trial court found that evidence of the Minit Mart robbery was relevant for the reasons asserted by the state. On this issue of relevancy, our task is to determine whether the record supports the trial court's finding. *State v. Pinnell, supra*, 311 Or at 109.

The trial court found many similarities between the Minit Mart and Plaid Pantry robberies. However, the similarity that definitively marks the two robberies as having been committed by the same actor is the use in both robberies of a distinctive sawed-off shotgun (State's Exhibit #14) that the trial court characterized as having a "unique" appearance. We summarize the evidence of that shotgun's uniqueness:

First, the Minit Mart robbery victim described the shotgun as a single-shot 12-gauge sawed-off shotgun which is loaded by breaking or folding down the barrel and slipping in a shell. He noticed that the ends of the barrel had holes on them that went around the barrel and looked like cuts. The cuts were intended to "kick off" flames out of the side of the barrel. The cuts make the shotgun not kick as hard, for the way it is designed, when the barrel is sawed off of the butt of the gun. He testified that he saw about four cuts or "slices" around the muzzle end of the barrel. Although he had some familiarity with firearms, he had never seen a shotgun that resembled this one.

Second, Oregon State Police criminalist Chris Johnson, who had extensive training in forensic science, ballistics and firearm identification, examined the shotgun. He testified that in his work as a criminalist he had seen several hundred shotguns and that about one-quarter of them were sawed off. When asked if any of those shotguns had any kind of vents, he replied, "Never. This is my first encounter with a sawed-off shotgun that has what I refer to as a muzzle brake."

Third, Detective Law testified that he had talked with Marion Tillman. She described the sawed-off shotgun defendant had showed her early in June, 1987. Her description generally matched that of a single-shot break-action sawed-off shotgun, with a thumb latch near the chamber where it is loaded. Tillman described some distinct characteristics of the shotgun's barrel, *i.e.*, several vertical cuts in the barrel made holes which released the gas which is caused

when a shotgun like that is fired and, in turn, reduced the shotgun's kick when it is fired. This modification appeared to be a "homemade job," as opposed to having it done commercially. The sawed-off shotgun recovered by Law (State's Exhibit #14) had these homemade cuts in its barrel.

Finally, Jolene Abbott, Marion Tillman, and the Minit Mart victim identified State's Exhibit #14 as the distinctive sawed-off shotgun previously possessed by defendant and used by him in the Minit Mart and Plaid Pantry robberies.

In sum, the record supports the trial court's finding that this sawed-off shotgun was so distinctive or "unique" that its use instantly earmarks both robberies as the "handiwork" of the same person. *State v. Johns, supra,* 301 Or at 551, and that defendant was that person. We, therefore, conclude that the evidence was logically relevant to prove defendant's identity as the perpetrator of the Plaid Pantry crimes and that he possessed State's Exhibit #14 before those crimes were committed.

Our conclusion that there is evidence in the record to support the trial court's finding of relevance, however, does not end our inquiry. The court still must decide whether to admit the evidence and should articulate reasons for that decision on the record. OEC 403 provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. Unless the court concludes that the probative value of the evidence is substantially outweighed by one or more of the countervailing factors, the evidence must be admitted. *State v. Pinnell, supra,* 311 Or at 112.

In reviewing a trial court's balancing decision, appellate courts give great deference to the trial judge, who saw and heard the evidence. We allow the trial judge some latitude in deciding whether the danger of unfair prejudice outweighs the probative value of the evidence and, normally, we will not second-guess the trial judge on these decisions. *State v. Mayfield,* 302 Or 631, 647, 733 P2d 438 (1987).

In making her decision under OEC 403, the trial

judge followed the approved method of analysis of such evidence. *See State v. Mayfield, supra,* 302 Or at 645 (establishing method); *State v. Johns, supra,* 301 Or at 557-59 (same). The judge considered the state's need for the evidence and found that the state needed the evidence because the Plaid Pantry victim was deceased; because Abbott, the state's key witness, was "highly impeachable" as an unindicted accomplice; and because defendant had denied possession of State's Exhibit #14. The judge found that there was "high certainty" that the Minit Mart robbery was committed and that defendant committed it based on the testimony of the Minit Mart victim and on defendant's own admission. The judge weighed the probative value of the evidence, *i.e.,* the extent to which evidence of the Minit Mart robbery helps to prove defendant's identity as the perpetrator of the Plaid Pantry crimes, against the risk of unfair prejudice to defendant, *i.e.,* the extent to which the evidence would invite the jury to convict defendant on the improper basis that he is a bad person, and concluded that the probative value of the evidence outweighed its potential for unfair prejudice. The judge articulated on the record her reasons for admitting the evidence.[8] There is evidence in the record to support the trial judge's findings. We hold that the trial court did not abuse its discretion in admitting the prior crimes evidence.

### Videotape

Defendant contends that the trial court erred in allowing the state to offer as evidence a copy of the videotape of the May 16 Minit Mart robbery. He argues that the evidence should have been excluded because the state violated his pretrial discovery rights concerning the tape and because the evidence was unfairly prejudicial.

The Minit Mart surveillance camera videotaped the May 16 robbery. The tape was made by four cameras positioned in different parts of the store that simultaneously transmitted pictures to a recorder. When projected on a television screen, the tape showed four pictures, each in a different quadrant of the same screen. A display at the bottom

---

[8] The trial court did not make a specific finding on the fifth *Johns* factor, *i.e.,* how time-consuming or distracting proof of other crimes or acts would be. *State v. Johns,* 301 Or 535, 558-59, 725 P2d 312 (1986). Defendant does not argue that the court's failure to articulate its finding on that factor is relevant to his appeal.

of the tape showed the date and time when the pictures were taken.

Because the tape did not provide a clear image of the robber, the police took it to a photo laboratory for enlargement. That process obliterated the date and time display at the bottom of the screen of the enlarged tape.

Despite enlargement, the videotape picture of the robber still was not clear. The police then sent the original tape to a second photo laboratory in California for computer enhancement, where the original tape was accidently lost. The first enlargement of the original tape and the attempted computer enhancement occurred several weeks before Law arrested defendant in this case. Before offering the enlarged videotape as evidence, the state made an offer of proof about its contents and proved its authenticity.

■     We first consider defendant's argument that the state violated his pretrial discovery rights. ORS 135.815 states in part:

> "[T]he district attorney shall disclose to the defendant the following material and information *within the possession or control* of the district attorney:
>
> "* * * * *
>
> "(4)   Any books, papers, documents, photographs or tangible objects[.]" (Emphasis added.)

The original videotape had been lost accidentally. It, therefore, was no longer "within the possession or control of the district attorney," at the time defendant requested its production. It, thus, was not subject to discovery by defendant under ORS 135.158. We hold that the trial court correctly ruled that the state did not violate defendant's pretrial discovery rights.

■     We next consider defendant's argument that he was unfairly prejudiced by introduction of the enlarged videotape. The enlarged tape lacked the time display that was part of the original tape. Defendant argues that the Minit Mart clerk testified that the robbery lasted three to four minutes, whereas the time display on the original tape showed that it took less time. He complains that he was denied an opportunity to cross-examine the clerk on the apparent discrepancy.

We fail to perceive, and defendant does not explain, what "substantial right" of his was affected by the trial court's ruling. OEC 103(1). Defendant had ample opportunity to cross-examine the Minit Mart clerk on this point. Detective Rubey testified that the original videotape showed that the robbery took one minute and twenty-four seconds. Rubey had watched the original tape and noted the beginning and ending times, respectively, as 11:15:15 and 11:16:39. Rubey's testimony directly contradicted the clerk's testimony, and defendant could have used Rubey's testimony (or the elapsed time of the videotape even without a time display on the screen) as a basis to cross-examine the clerk. We find that no actual prejudice to defendant has been shown. We hold that the trial court did not abuse its discretion in denying defendant's motion to suppress.

### Telephone Recordings

Defendant contends that the trial court erred in admitting evidence of a tape recorded telephone conversation between Leshia Hart and himself. He argues that Hart did not voluntarily consent to record the conversation.

Hart testified at trial that she was acquainted with both defendant and Abbott. A few days after July 28, 1987, Hart and Abbott discussed the Plaid Pantry crimes. The police contacted Hart shortly thereafter. When they asked Hart if she would be willing to record telephone calls from defendant, she agreed. At trial, Hart testified that the police made no promises to her and did not threaten or coerce her and that she made the recording because she believed that she was doing Abbott, her friend, a favor. She was aware that a reward was being offered for information about the Plaid Pantry crimes.

In *State v. Dimeo*, 304 Or 469, 747 P2d 353 (1987), this court held that a police informant must voluntarily consent to make a recording; otherwise, the recording is not admissible against the other person recorded. *Id.* at 473-79. In *Dimeo*, this court articulated the test for voluntary consent:

"We hold that * * * the test for voluntary consent of telephonic recordations should be as set forth in other 'consent' cases. Although used in a different context, those cases hold that the 'proper test for voluntariness is to examine the totality of the facts and circumstances to see whether the

consent was given by * * * free will or was the result of coercion, express or implied.' *State v. Wolfe,* 295 Or 567, 572, 669 P2d 320 (1983) (citing *State v. Kennedy,* 290 Or 493, 502, 624 P2d 99 (1981))." *State v. Dimeo, supra,* 304 Or at 474.

Voluntariness of consent must be shown by a preponderance of the evidence. *State v. Stevens,* 311 Or 119, 137, 806 P2d 92 (1991). We hold that Hart's testimony standing alone was sufficient to support the trial court's conclusion that, more likely than not, Hart's consent was voluntary.

### *Cross-Examination*

■ Defendant contends that the trial court erred in restricting defense counsel's cross-examination of Marion Tillman.

At trial, defense counsel cross-examined Tillman at length about: whether she was testifying voluntarily; her association with defendant; what she told the police about him; her driving to convenience stores in Beaverton with defendant; her knowledge of the sawed-off shotgun (State's Exhibit #14); her familiarity with firearms; her criminal record; her conversations with defense counsel and counsel's investigator about this case; and her knowledge that a reward had been offered for information about the Plaid Pantry crimes.

■ Defense counsel cross-examined Tillman further:

"Q   Have you ever said that as an expression of how you have an interest in homicides, that you're quote into homicides close quote?

"A   (Nods head.)

"Q   You have to answer yes.

"A   Yeah. Yeah.

"Q   And —

"A   My interest level is real high.

"Q   Real high in homicides?

"A   Yeah.

"Q   You get a lot of information about homicides?

"[PROSECUTOR]:   Object as irrelevant.

"THE COURT:   Sustained.

"Q   Do you know about other homicides besides this one?

"[PROSECUTOR]:   Object as irrelevant.

"THE COURT: Sustained.

"Q   How does a person be into homicide?

"[PROSECUTOR]:   Object as argumentative, irrelevant. I'll object to the form of the question also.

"* * * * *

"THE COURT:   [Defense counsel] to what issue is that question relevant?

"[DEFENSE COUNSEL]: *Competency.* Just the fact that she makes this stuff up. She's out there, Your Honor. She's got — I've got her on tape telling my investigator * * * she knows about all kinds of homicides, people being killed all over the place. The lady has just got this thing about homicides. And I think it's important that I bring that out in front of this Jury because she puts things in front of other things and she makes things up and everything she's got even comes out of the paper.

"* * * * *

"THE COURT:   The objection is sustained. [To the witness] You don't need to answer the question. Put another question to her, [defense counsel]." (Emphasis added.)

Tillman's interest in homicide was not mentioned again. Defendant did not ask that he be given an opportunity to cross-examine Tillman outside the presence of the jury to make a record of what she meant by her testimony that she was "into homicides," or to explore whether her interest in homicide might have affected her competency.

OEC 611 provides in part:

"(1)   The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth, avoid needless consumption of time and protect witnesses from harassment or undue embarrassment.

"(2)   Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

Assuming, *arguendo,* that defense counsel's statement to the

trial court constituted an offer of proof,[9] the record shows that defense counsel was given free-reign to cross-examine Tillman about the subject matter of her direct examination by the state.

The precise question to which the prosecutor objected, "How does a person be into homicide," was, at best, overly general and ambiguous. Although the trial court did not explain the grounds on which it sustained the prosecutor's objection to defense counsel's question, we believe that the prosecutor's objection to "the form of the question" was well-taken. Moreover, the trial court did not foreclose defense counsel from asking other questions relevant to Tillman's "competency." After sustaining the prosecutor's objection, the court directed counsel to "put another question to [Tillman]." At that time, defense counsel had the opportunity to ask Tillman any other proper question relevant to the issue of her competence.

This is not a case where the trial court's ruling foreclosed *all* inquiry into the question of Tillman's competency. Defendant has not shown that the court's ruling prohibited him from engaging in otherwise appropriate cross-examination designed to show that Tillman's ability to perceive and remember was impaired. Defendant has not explained, nor do we perceive, how the court's ruling prejudiced any substantial right of his. OEC 103(1). In these circumstances, we hold that the trial court did not abuse its discretion in sustaining the prosecutor's objection to defense counsel's question.

■ ■ On appeal, defendant argues for the first time that

---

[9] When cross-examination is restricted, an offer of proof is required in order to preserve the record for appeal. *State v. Affeld,* 307 Or 125, 128-29, 764 P2d 220 (1988). The state argues that defense counsel's statement to the trial court was not an offer of proof. Because we conclude that the trial court did not abuse its discretion, we do not decide whether counsel's statement was an offer of proof.

OEC 103(1)(b) provides in part:

"Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which * * * excludes evidence unless a substantial right of the party is affected, and:

"* * * * *

"In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

the trial court's ruling violated his Sixth Amendment confrontation rights.[10] Defendant did not raise any federal confrontation issue in the trial court. He neither cited the Sixth Amendment nor made any argument based thereon. Therefore, we decline to consider defendant's Sixth Amendment argument. *State v. King, supra,* 307 Or at 338; *State v. Hitz,* 307 Or 183, 188-89, 766 P2d 373 (1988).

### *Judgment of Acquittal*

Defendant contends that the trial court erred in denying his motion for judgment of acquittal on all four counts of the indictment. He argues that the state's evidence was insufficient to permit the jury to have found beyond a reasonable doubt the essential elements of the crimes charged. In his brief, however, defendant concedes:

> "That [the victim] was robbed and murdered is proven beyond any doubt by the evidence."

Thus, we understand defendant to argue only that the evidence was insufficient for the jury to have found beyond a reasonable doubt that *he* robbed and murdered the victim.

In *State v. King, supra,* 307 Or at 339, this court stated:

> "In ruling on the sufficiency of the evidence in a criminal case, the relevant question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *State v. Harris,* 288 Or 703, 721, 609 P2d 798 (1980). It is not proper for us to hold that there is a reasonable doubt because of conflicts in the evidence. After a verdict of guilty, such conflicts must be treated as if they had been decided in the state's favor. After the conflicts have been so decided, we must take such decided facts together with those facts about which there is no conflict and determine whether the inferences that may be drawn from them are sufficient to allow the jury to find defendant's guilt beyond a reasonable doubt. Our decision is not whether we believe defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for a jury so

---

[10] In a criminal case, the right of cross-examination is part of the Sixth Amendment right of confrontation. *Davis v. Alaska,* 415 US 308, 316-17, 94 S Ct 1105, 39 L Ed 2d 347 (1974); *Smith v. Illinois,* 390 US 129, 131-33, 88 S Ct 748, 19 L Ed 2d 956 (1968).

to find. *State v. Krummacher,* 269 Or 125, 137-38, 523 P2d 1009 (1974)."

In *Jackson v. Virginia,* 443 US 307, 319, 99 S Ct 2781, 61 L Ed 2d 560, *reh'g den* 444 US 890 (1979), the Supreme Court of the United States identified the same standard for reviewing sufficiency of the evidence claims under the Fourteenth Amendment.

We conclude that the extensive evidence in the record to which we have alluded throughout this opinion was sufficient to permit a rational trier of fact to have found beyond a reasonable doubt that defendant robbed and murdered the victim. We hold that the trial court correctly denied defendant's motion for judgment of acquittal on all counts of the indictment.

Defendant next contends that the trial court erred in denying his motion for judgment of acquittal on count 2 ("perpetrator-concealment" theory of aggravated murder) of the indictment. He asserts that the only evidence supporting count 2 is Abbott's testimony that, when defendant emerged from the Plaid Pantry, he told her that he had shot the victim because "the man was stepping from the counter like he was going to go step on an alarm or something." Defendant argues that the state could not convict him on the basis of Abbott's uncorroborated testimony, because she was his accomplice. *See* ORS 136.440(1).[11]

By its terms, ORS 136.440(1) requires only that the corroborating evidence tend to connect defendant with the commission of the offense, here, aggravated murder. That statute does not require corroboration of a particular *theory* of the commission of the offense. *See State v. Caldwell,* 241 Or 355, 361, 405 P2d 847 (1965) (it is sufficient if there is some evidence, however slight, tending to connect the defendant with the crime); *State v. Long et al,* 113 Or 309, 311-12, 231 P 963 (1925) (corroboration must go to the fact that a crime has been committed and that the defendant was implicated in it).

---

[11] ORS 136.440(1) provides:

"A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of the commission."

It is not necessary that the corroborating evidence be direct and positive; it may be circumstantial. *State v. Krummacher, supra,* 269 Or at 137-38; *State v. Caldwell, supra; State v. Rosser,* 162 Or 293, 341-42, 86 P2d 441, *order vacated on reh'g* 162 Or 293, 87 P2d 783 (1939). Nor it is necessary that there be independent corroborating evidence with respect to every material fact necessary to be established to sustain a conviction for the commission of a crime. *State v. Doster,* 247 Or 336, 343, 427 P2d 413 (1967). Where there is any evidence apart from that of the accomplice tending to connect the defendant with the commission of the crime, the question of whether the accomplice's testimony is corroborated is one for the trier of fact. *State v. Long et al, supra,* 113 Or at 312.

Viewing the evidence in the light most favorable to the state, *State v. King, supra,* 307 Or at 339, we conclude that the extensive evidence in the record to which we have alluded throughout this opinion was sufficient to permit a rational trier of fact to have found that Abbott's testimony was corroborated. Thus, the requirements of ORS 136.440(1) were satisfied. We hold that the trial court correctly denied defendant's motion for judgment of acquittal on count 2 of the indictment.[12]

### Death Qualification of Jury

Defendant contends that the trial court erred in denying his pretrial motion to prohibit "death qualification" of the jury. He argues that the court should have prohibited the state from inquiring whether jurors' consciences or beliefs would prevent them from imposing the death penalty. Alternatively, he argues that the court should have prohibited the state from asking those questions until the penalty phase of his trial, if there was one. We rejected substantially the same arguments in *State v. Montez,* 309 Or 564, 608, 789 P2d 1352 (1990). Therefore, we find no error.

### Effect of Sympathetic Evidence

Defendant contends that the trial court erred in limiting his *voir dire* inquiry into the effect of sympathetic evidence on jury deliberations. He argues that the trial

---

[12] The state correctly notes that, even if defendant escaped conviction on count 2 on this basis, the jury nevertheless convicted him of aggravated murder on count 1, and that sufficient evidence in the record supports that conviction.

court's ruling prevented him from assessing the extent to which each of the jurors may have had a sympathetic response to mitigating evidence and, thus, it prevented him from exercising his peremptory challenges intelligently. He also argues that the trial court's ruling denied him his right to an impartial jury and, thus, a fair trial. Defendant relies primarily on *California v. Brown,* 479 US 538, 107 S Ct 837, 93 L Ed 2d 934 (1987).

During *voir dire,* defense counsel told a juror that, at the penalty phase of the case, sympathy, bias, and prejudice "are the issues in a way. * * * [T]hat's almost what this case is about." The trial court restricted further comments and questioning by defense counsel along those lines. In *State v. Moen, supra,* 309 Or at 86-93, this court considered *California v. Brown, supra,* and its role in relation to "sympathy" in a capital case. Our discussion of this issue in *Moen* answers defendant's arguments here. Therefore, we find no error.

### Juror Gephardt

Defendant contends that the trial court erred in excusing Juror Gephardt for cause. Gephardt opposed the death penalty. Defendant argues that the court's action denied him his right to an impartial jury.

In *State v. Montez, supra,* 309 Or at 574-75, this court explained that the question is whether the prospective juror's views would prevent or substantially impair his or her performance of the duties of a juror if selected:

> "In the quest for jurors who will conscientiously apply the law and find the facts, the question is whether the juror is capable of 'trying the case fairly and impartially upon the evidence adduced in court.' * * *.

> "Whether a juror is actually biased or not is a question of fact to be determined by the trial court in the exercise of its discretion. ORCP 57 D(1)(g). That court has the advantage, which we lack, of seeing the challenged prospective juror and observing the juror's demeanor, apparent intelligence and candor, all of which are factors in the trial of a challenge for cause. * * * The trial court's judgment as to a prospective juror's ultimate qualifications is entitled to great weight. The court's decision will not be disturbed absent a finding of an abuse of discretion. * * *.

> "A prospective juror's approval of or opposition to the death penalty alone is not determinative of whether the juror

may serve as a juror or must be excused. The question is whether the prospective juror's views would prevent or substantially impair the performance of his or her duties if selected as a juror. * * * However, it is not enough that a prospective juror believes that he can be fair and impartial. The trial court in exercising discretion must find from all the facts that the juror will be impartial and fair and not be consciously or unconsciously biased. The test of a juror's disqualification is the probability of bias or prejudice as determined by the court." (Citations and footnote omitted.)

The trial court excused Gephardt for cause after concluding that she could not follow the court's instructions and that she was biased against the state. There is evidence in the record to support the trial court's determination that Gephardt's views would prevent or substantially impair her performance as a juror. We hold that the trial court did not abuse its discretion in excusing Gephardt for cause. *State v. Montez, supra.*

### *Motion to Dismiss*

Defendant contends that the trial court erred in denying his supplemental motion to dismiss the indictment. Defendant's motion alleged:

"1. The procedure used to select the members of the Grand Jury is fundamentally and constitutionally flawed in that it systematically excludes cognizable groups from the pool of jurors from which the Grand Jury is selected;

"2. The systematic exclusion of certain groups from the pool of persons from which the Grand Jurors are selected deprives Defendant in this case of a fair representative cross section of the community and of fundamental due process."

In denying defendant's motion, the trial court held:

"[D]efendant has failed to prove that the Grand Jury was not composed of a fair racial sampling of the community as a result of a system of exclusion of racial groups from the juror selection process."

On appeal, defendant argues:

"[I]n *State ex rel Schrunk v. Walker, Ellis, and Snouffer,* 308 Or 398, 404, 780 P2d 731 (1989) this court held * * * that jury selection procedures in use in Multnomah County since 1985 were consistent with statutory requirements, and that ORS 10.215(1), prescribing the method by which master jury

lists are to be developed, provides a reasonable method for obtaining a 'fair cross-section' of the community as potential jurors. This analysis took into account challenges based on the availability of alternative methods of composing master jury lists; this court ruled that the statute did not require Multnomah County to do more than it had done to date. *The holding appears to answer the contentions made. This argument is therefore repeated in this appeal in order to exhaust defendant's state-court remedies, should the issue become pertinent at a later date. Wainwright v. Sykes,* 433 US 72, 93 L Ed 2d 594, 97 S Ct 2497 (1977)." (Emphasis added.)

We understand the sentence emphasized in the preceding quotation to mean that defendant believes that this court's holding in *State ex rel Schrunk v. Walker, supra,* answers all the contentions he made in the trial court concerning this issue. Defendant misreads our holding in *Schrunk.*

The issue of the racial composition of the Grand Jury panel in Multnomah County was *not* an issue in the *Schrunk* case. The only issue was whether Multnomah County had complied with the pertinent procedural statutes in compiling its jury lists. In *Schrunk,* race was never mentioned, there was no constitutional challenge, and there was no holding that the Multnomah County lists provided a constitutionally "fair cross-section" of the community.

On appeal, defendant asserts that, at trial, he made a preliminary showing that "blacks" were disproportionately under-represented on the panel of prospective jurors. He concedes, however, that "the trial court record shows that the selection process was race-neutral and that there is no way to determine on this record whether black people seek hardship, medical, or other exemptions from jury service at a rate comparable to that of whites."

██ ██ Defendant also asserts that an all white grand jury indicted him. Nothing in the record supports that assertion. Because the record contains no evidence regarding the racial makeup of the grand jury or of the venire from which the grand jury was randomly selected, defendant has not made a

*prima facie* showing that the state has engaged in discrimination in any jury selection procedures.[13] Defendant, thus, has not sustained his burden to prove the existence of purposeful discrimination. *Batson v. Kentucky,* 476 US 79, 93-94, 106 S Ct 1712, 90 L Ed 2d 69 (1986). We hold that the trial court did not err in denying defendant's supplemental motion to dismiss the indictment.

### Mistrial Motions

Defendant first contends that the trial court erred in denying his motion for a mistrial based on the prosecutor's references to a "defense expert" during the state's case-in-chief. He argues that the effect of the reference was to shift to the defense the burden of going forward with expert testimony, that the jury might have held the failure to produce the alleged expert against the defense, and that the implication of the prosecutor's reference was a comment on defendant's testimonial privilege.

During the state's case-in-chief, Christopher Johnson testified about the sawed-off shotgun (State's Exhibit #14). During the state's redirect examination of Johnson, the following exchange occurred:

"Q   One other question. Mr. Johnson, are you aware of whether or not an expert from the defense has examined the shotgun?

"A   Yes I am.

"[DEFENSE COUNSEL]:   I object to that and ask the question and answer be stricken. It places some burden on [defendant] to come forward as with a defense at this point.

"THE COURT:   I will sustain the objection. The question and answer will be stricken. The jury should disregard it."

Defendant at first appeared to have been satisfied with that ruling. However, after two other witnesses had testified about subjects unrelated to State's Exhibit #14, defendant moved for a mistrial:

---

[13] If a *prima facie* case of invidious discrimination is established, the burden of proof shifts to the state to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result. *Alexander v. Louisiana,* 405 US 625, 631-32, 92 S Ct 1221, 31 L Ed 2d 536 (1972).

"[DEFENSE COUNSEL]: While on the record, I want to move at this time for a mistrial for prosecutorial misconduct for what [the prosecutor] said in regard to our expert having examined the gun. It unfairly places the burden of proof on the defense. I notice that the court did ask [*sic*] that it be stricken and the jurors disregard it. I don't know how we can unring that bell. With the prosecution insisting upon [defendant] proving his innocence in any way, then we haven't a chance for a fair trial in a case where [defendant] is facing the death penalty. I will ask for a mistrial every single time he does that."

The trial court denied defendant's motion.

During rebuttal, the state recalled Johnson to testify about another test that he had conducted with State's Exhibit #14. After the state rested, defendant renewed his motion for a mistrial:

"[DEFENSE COUNSEL]: I also at this time want to renew the motion for a mistrial based upon the prosecutorial misconduct of [the prosecutor's] question about the defense expert having viewed the evidence. And I think now that Mr. Johnson testified again, and we have decided we were not going to call [our expert], it becomes even more objectionable. And so I would renew that motion at this time."

Defendant did not request a curative instruction. The court again denied defendant's motion.

■ To preserve error, a motion for a mistrial must be timely. *State v. Montez, supra,* 309 Or at 601. It is timely if it is made when the allegedly objectionable statements were made. *State v. Shafer,* 222 Or 230, 235, 351 P2d 941 (1960). Defendant's motions here were not timely made and, thus, this claim of error was not preserved for appeal, and we decline to consider defendant's argument.[14]

■ Defendant next contends that the trial court erred in failing *sua sponte* to grant a mistrial because his right to be present at all stages of the proceedings was impaired.[15] He argues for the first time, on appeal, that his absence from a

---

[14] In concluding that this claim was not preserved for appeal, we do not decide whether the prosecutor's question was objectionable.

[15] Mistrials granted *sua sponte* are disfavored because of the former jeopardy problems they may create. *See e.g., State v. Cole,* 286 Or 411, 595 P2d 466, *cert den* 444 US 968 (1979) (trial judge taken seriously ill and confined to hospital).

pretrial conference violated his constitutional right to be present at every stage of his trial, his rights to counsel, confrontation, and due process, and his rights under ORS 136.040.[16]

■ Defendant was not personally present at a pretrial conference in chambers during which various matters were discussed, including jury selection, discovery, witnesses, and evidence. The bulk of the conference was a discussion of the specific wording of the *voir dire* questionnaire that would be given to the jurors. This conference, which was held on the record, was attended by the trial judge, the prosecutor, defendant's counsel, and the court reporter. The record does not explain defendant's absence. His counsel, however, did not object to his absence. Defendant has not shown either by proper assignment of error in his brief or otherwise that any such objection to his absence from the pretrial conference was made in the trial court. In the absence of an objection by defendant at trial, this claim of error was not preserved for appeal. *See State v. Stroup,* 290 Or 185, 205, 620 P2d 1359 (1980), *reh'g den* (1981) (question not raised and preserved at trial will not be considered on appeal); *State v. Hickmann,* 273 Or 358, 360, 540 P2d 1406 (1975) (same); *State v. Beeson,* 248 Or 411, 414, 434 P2d 460 (1967) (no reversible error where no objection made at trial and no prejudice occurred); *State v. Rohde,* 245 Or 593, 595-97, 421 P2d 690 (1966), *cert den* 387 US 924 (1967) (same). Therefore, we decline to consider defendant's argument.

■ Moreover, defendant has not shown that he was prejudiced by his absence from the pretrial conference. He neither suggests that anything occurred at the conference which had the slightest effect on his case nor indicates what suggestions or assistance he would have given his counsel or the court had he been present. Nor did he ask for a post-trial hearing on this issue. Under these circumstances, we conclude that this assignment of error lacks merit. *See Kentucky v. Stincer,* 482 US 730, 107 S Ct 2658, 96 L Ed 2d 631 (1987)

---

[16] ORS 136.040 provides:

"If the charge is for a misdemeanor, the trial may be had in the absence of the defendant if the defendant appears by counsel; but if it is for a felony, the defendant shall appear in person."

This statute clearly refers only to personal appearance at the "trial." *State of Oregon v. Kuhnhausen,* 201 Or 478, 545, 266 P2d 698, 272 P2d 225 (1954).

(exclusion of defendant from pre-trial hearing on competency of child witnesses did not violate defendant's confrontation or due process rights).

■    Defendant next contends that the trial court erred in denying his motion for a mistrial after a juror and an alternate juror observed him in handcuffs with a group of other prisoners. He argues that the observation may have influenced those jurors, thereby denying him a fair trial and due process.

After the incident, the trial court questioned the juror and the alternate juror, individually and outside the presence of the other jurors. Both stated that, although they had seen defendant in handcuffs, they had not discussed their observations with any other juror and that their observations would not affect their impartiality. The court instructed both jurors that they were to disregard their observations, that they were not to discuss their observations with anyone, and that defendant's custody status had no bearing on his guilt or innocence. The alternate juror did not participate further in defendant's trial.

■    Jurors are presumed to follow a trial court's instructions. *State v. Smith,* 310 Or 1, 26-27, 791 P2d 836 (1990). Defendant has not shown that the juror who served in his case did not follow the court's instructions. Moreover, the court offered to replace the juror who did serve in his case with an "untainted" alternate. Defendant rejected that offer, insisting that the court had to empanel a whole new jury. The court was not required to do that. *State v. Montez, supra.* We find no error.

In summary, we find no reversible error as to the guilt phase of defendant's trial. Accordingly, we affirm defendant's convictions on all four counts of the indictment.

## B.   PENALTY PHASE

*Mitigating Evidence*

■    Defendant contends that the trial court erred, during the penalty phase of his trial, in refusing to give his requested instruction on mitigating evidence.

The state concedes, and we agree, that the trial court's penalty phase instructions were inadequate to comply with this court's opinion in *State v. Wagner,* 309 Or 5, 14-20, 786 P2d 93, *cert den* ___ US ___, 111 S Ct 212, 112 L Ed 2d 171 (1990), which was decided after the trial in this case. Therefore, we vacate defendant's death sentence and remand this case to the circuit court for further proceedings consistent with this opinion.

## C. OTHER ASSIGNMENTS OF ERROR

*Motion to Compel Plea Offer*

We discuss only one of defendant's other assignments of error because it may recur on remand. Defendant contends that the trial court erred in denying his motion to compel a plea offer to a non-capital crime. He first argues that Oregon's statutory criminal homicide scheme allows for the unbridled exercise of prosecutorial charging and discretion in violation of Article I, sections 15 and 16, of the Oregon Constitution, and the Eighth Amendment to the United States Constitution. He also argues that the unbridled discretion to seek the death penalty conferred on prosecutors by Oregon's statutes renders the death penalty capricious in violation of Article I, section 20, of the Oregon Constitution and the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. We rejected substantially the same arguments in *State v. Montez, supra,* 309 Or at 606.

Defendant argues further that the prosecutor's decision to refuse to engage in plea negotiations *with him* was improper. Before trial, defendant moved:

"[F]or an order directing the District Attorney for Multnomah County to disclose the office charging policy regarding aggravated murder/death penalty cases. In the absence of a showing that offers to plead to a non-capital crime are made 'upon the same terms' to all, defendant moves for an order directing the District Attorney of Multnomah County to offer to allow this defendant to plead to a non-capital crime."

The trial court granted defendant's motion to disclose the prosecutorial policy, but it denied his motion to compel the prosecutor affirmatively to offer him an opportunity to plead to a non-capital crime:

"The Court * * * finds [that]: there is no written prosecutorial policy, however, the policy articulated by the District Attorney and unimpeached by the defense, does in fact

state reasonable guidelines under which an offer to plead to a non-capital case is extended by the prosecution. The Court further finds that at no time has the defense requested an opportunity to plead to a non-capital case."

This court's resolution of a similar contention in *State v. Farrar,* 309 Or 132, 137-38, 786 P2d 161 (1990), is controlling here:

"Defendant does not dispute that the state had sufficient factual basis for charging him with aggravated murder. The district attorney's decision to seek an aggravated murder indictment against him was proper on its face. Placing defendant within the class of person charged with aggravated murder was consistent with a proper application of a neutral, objective and appropriate standard: probable cause to believe that defendant committed the crime. The record shows that that was the district attorney's motive here.

"Defendant does not contend, and no evidence in the record suggests, that the district attorney's decision to seek an aggravated murder indictment was prompted by improper motives, or indeed by any reason other than that the district attorney had sufficient evidence to prove beyond a reasonable doubt that defendant committed aggravated murder. The district attorney's decision to seek an aggravated murder indictment against defendant did not treat him differently from any other similarly situated person. Nothing in this record suggests that the district attorney ever has failed or refused to seek an aggravated murder indictment when he had probable cause to believe that specific persons [*sic*] committed aggravated murder * * *."

Defendant never attempted to establish that the District Attorney's decision to seek an aggravated murder indictment *in this case* was prompted by any improper motive or by any reason other than that the District Attorney believed that he had sufficient evidence to prove beyond a reasonable doubt that defendant committed aggravated murder. We hold that the trial court correctly denied defendant's motion.

## CONCLUSION

We have considered each of defendant's assignments of error and every argument made in support thereof. Any assignment or argument not discussed in this opinion either has been considered by this court previously and resolved

against defendant, or is not well taken, or is unlikely to recur on remand. We find no reversible error based on those assignments of error.

## DECISION

The judgment is affirmed as to defendant's convictions for aggravated murder, felony murder, and robbery in the first degree. The sentence of death is vacated. The case is remanded to the circuit court for further proceedings consistent with this opinion.

**FADELEY, J.,** dissenting.

I dissent for the reasons stated in the dissenting opinion in *State v. Moen,* 309 Or 45, 102-04, 786 P2d 111 (1990) (Fadeley, J., dissenting). Following the United States Supreme Court's decision in *Penry v. Lynaugh,* 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989), that court, in *Wagner v. Oregon,* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989), vacated an Oregon death penalty sentence, because of inadequacy in Oregon's statute providing the method whereby a jury determines the sentence to be imposed.

That statute was proposed by the initiative process and adopted by a vote in 1984. On remand of *Wagner v. Oregon* by the United States Supreme Court, the Oregon Supreme Court reacted by a majority decision to save the initiated statute by adding a 100-word amendment. *See State v. Moen, supra,* 309 Or at 102-04 (dissenting opinion).

I continue to dissent from the decision of the majority to make an after-the-fact addition to the statute that the people, by their vote adopting the statute, did not put there.