# STATE OF OREGON,
*Respondent,*

*v.*

# MICHAEL EDWARD HAYES,
*Appellant.*

# (C930154CR; CA A80905)

899 P2d 1198

Irene B. Taylor, Deputy Public Defender, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender.

Jonathan H. Fussner, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

RIGGS, P. J.

**RIGGS, P. J.**

Defendant appeals his convictions for first degree rape, third degree rape, and third degree sodomy. ORS 163.375; ORS 163.355; ORS 163.385. He argues that the trial court erred in admitting evidence that he failed to appear for a scheduled blood draw appointment. The state concedes that the trial court erred, but argues that the error was harmless. We affirm.

■ Following a conviction, we review the evidence in the light most favorable to the state. *State v. Brown*, 310 Or 347, 350, 800 P2d 259 (1990). On the evening of August 9, 1994, defendant drank a case of beer at his apartment. He then went to a coworker's apartment, where he had agreed to spend the night in order to help move some items the next morning. The coworker's four children, including the 14-year-old victim, were also at the apartment. While at the apartment, defendant drank five or six more beers before they all went to sleep. The coworker slept in the bedroom with his two sons, the two daughters slept on a mattress on the living room floor and defendant slept on the floor between the kitchen and the living room.

One of the daughters woke up in the middle of the night with defendant on top of her trying to engage in intercourse with her. Her jeans and panties were on the floor next to her. She curled up to try to get him to stop, but he grabbed her ankles and pulled her legs apart. He kissed her and put his tongue on her vagina and repeatedly tried to have intercourse with her. At some point, defendant asked the victim whether she was awake and she replied that if she were awake, she might do something that she would regret. He got off her and she got dressed. He then apologized, got dressed and left at about 4:30 or 5:00 a.m. He did not return that day to help the victim's father move.

When the rest of the family awoke, the victim had already taken a shower; she was upset and refused to speak to anyone except her Aunt Peggy. Her father took her to her aunt's house, where she revealed that she had been raped. Her father called the police and they brought her to the emergency room. Samples of hair and swabs from her vagina were taken, but no evidence of sperm was found.

On August 18, 1993, Detective Danielson contacted defendant at work and asked defendant about his activities on August 9. Defendant said that he could not remember anything that happened between drinking the case of beer and waking up around 6:00 a.m. the next morning in his Lake Oswego apartment. Defendant and Danielson then made arrangements to meet the following morning. Shortly after 5:00 p.m., defendant called Danielson and said that Danielson might as well come back and get him; he did not want to cause anybody any more trouble. Danielson assured defendant that it would be best to meet the following morning as planned.

The next morning, defendant met with Danielson for a tape-recorded interview. After defendant was advised of his *Miranda* rights, Danielson described what the victim alleged to have occurred. Defendant said "I don't remember doing any of that[;] * * * I would never do anything like that." Danielson then asked under what conditions he might do something like that and defendant replied:

"A. "If I was sober, I wouldn't do anything like that.

"Q. What about if you were drunk?

"A. I don't know.

"* * * * *

"Q. Do you remember not doing it?

"A. I'm not denying it and I'm not admitting to it.

"* * * * *

"A. I mean, you know, I'm in a situation that she says I did it, you know, I can't — I'm not going to deny it. So, I mean —.

"Q. You feel — you feel some responsibility here?

"A. Yeah.

"* * * * *

"A. If I did it, I feel really bad.

"* * * * *

"Q. What I'm trying to do is help you deal with that as best you can — with the issue of whether you — that you did it or not.

"A. Oh I'm sure I did."

Defendant eventually recalled talking to the victim and apologizing to her before leaving her apartment. Danielson continued to ask him what else he remembered from that night:

"Q. Did you lay on top of her?

"A. That I don't know. I honestly don't know if I did or not. If she says I did, I must have.

"Q. Why would you say I'm sorry?

"A. Well, because I wasn't sure what I was doing, that — it was wrong.

"* * * * *

"Q. Do you remember apologizing to her?

"A. Yeah, I remember apologizing to her.

"Q. Do you remember what happened before that? What happened before that?

"A. Well, evidently, I must have tried to rape her. I don't remember doing it, but I must have, and I can't deny it and I'm not even — you know, I'm not going to."

At the end of the interview, Danielson took some hair samples and arranged for a blood draw the following Friday. The next day, an attorney called Danielson and said that defendant was invoking his constitutional rights until further notice. Defendant did not appear for the blood draw.

At trial, the victim, her father, her sister and her aunt testified. In addition, Danielson, the examining physician, the emergency room nurse and a number of other witnesses testified for the prosecution. Defendant did not testify, but the tape-recorded interview with Danielson was played. During the state's case-in-chief, Danielson testified as follows:

"Q. Were you available in your office to provide that service to obtain the blood sample from [defendant] on Friday at 9:00 a.m.?

"A. Yes.

"Q. Did [defendant] keep that appointment with you?

"A. No."

Defendant objected to the testimony as an improper comment on the exercise of his constitutional right to silence, but the objection was overruled. At the end of the trial, in the rebuttal argument to the jury, the prosecutor said:

"Ask yourself some questions. Ask yourself what caused [defendant] to leave that morning? Where did you go, [defendant]? Weren't you going to help move? Why did you go home? Why did you get out of bed at 4 o'clock in the morning or 5 o'clock in the morning drunk, so drunk that he tells Danielson that when he woke up the next morning in Lake Oswego, all he could do is smoke a cigarette and go back to bed, he was so hungover. Yet he got out of bed at 4:30 or 5 o'clock in Beaverton, Walker Road, and decided to drive home to Lake Oswego? Why did you do that [defendant]? What caused you to go? What caused you to leave your plans? *What caused you to not show up for the blood draw with Detective Danielson on Friday?* What caused you to not show up for the interview with — Why did you do this, [defendant]?" (Emphasis supplied.)

Defendant was convicted.

■■ On appeal defendant argues that the court erred in allowing the prosecution to comment on his exercise of the constitutional right to silence by allowing the prosecution to refer to his failure to show up for the blood draw. The state concedes that the court erred and, although we are not bound by the state's concession, *State v. Jones*, 129 Or App 413, 879 P2d 881 (1994), we agree that the court erred.

■■ Nonetheless, the state argues that the error was harmless. There is no doubt that, normally, it is reversible error to

"admit evidence of the exercise by a defendant of the rights which the constitution gives him if it is done in a context whereupon inferences prejudicial to the defendant are likely to be drawn by the jury." *State v. Smallwood*, 277 Or 503, 505-06, 561 P2d 600, *cert den* 434 US 849 (1977).

But error, even of constitutional proportions, may be found harmless. *State v. Walton*, 311 Or 223, 230-31, 809 P2d 81 (1991). The harmless error rule, which arises from Article VII (amended), section 3, of the Oregon Constitution,[1] requires

---

[1] Article VII (amended), section 3, of the Oregon Constitution provides:

"If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial."

*See also State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988) ("Article VII (Amended), section 3, of the Oregon Constitution requires this court to affirm

us to affirm a defendant's conviction, even though a trial court committed error,

> "whenever there is (1) substantial and convincing evidence of guilt and (2) little, if any, likelihood that the error affected the verdict." *State v. Parker*, 317 Or 225, 233, 855 P2d 636 (1993).

■     Under the federal constitution, we review the whole record before us to determine whether the error identified was harmless beyond a reasonable doubt. *Chapman v. California*, 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967).

> "The question a reviewing court must ask is this: absent the prosecutor's allusion to [defendant's assertion of his right to silence], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *United States v. Hasting*, 461 US 499, 510-11, 103 S Ct 1974, 76 L Ed 2d 96 (1983).

■     In this case, the evidence of guilt was substantial, convincing and overwhelming. Defendant clearly had the opportunity to commit the crime. The uncontradicted testimony of the victim, as well as her father and sister, established that defendant was very drunk and spent the night at the apartment. The victim testified in detail to defendant raping and sodomizing her. They also all consistently testified that defendant inexplicably left before 5:00 a.m. and did not return to help move or call. This was not a case of "his word against hers," or even "her word against nothing." Defendant did not testify at trial, but the recording of his interview with Danielson was introduced into evidence. In the interview, defendant virtually admitted committing the crime.

In addition, there is little likelihood that the error affected the verdict. The jury could infer from statements such as:

> "Evidently, I must have tried to rape her. I don't remember doing it, but I must have, and I can't deny it and I'm not even — you know, I'm not going to,"

that defendant believed that he had raped and sodomized the victim. The court's error did no more than allow in other evidence allowing the jury to make the same inference. The

judgments of lower courts if, in the opinion of this court, the judgment achieved the correct result, even if error was committed.")

error was not likely to have affected the verdict in these circumstances. *State v. Smallwood*, 277 Or 503, 509, 561 P2d 600 (1977).

In this case, even though the court erred, the evidence of defendant's guilt was substantial and convincing and there was little likelihood that the error affected the verdict. Accordingly, we conclude that the error was harmless under both the federal and Oregon constitutions.

Affirmed.