HADLOCK, P. J.
*45 Defendant appeals a judgment reflecting his conviction for first-degree criminal trespass. It is undisputed that defendant entered the residence of his former wife, E, during a sale that was being held there after she moved out, at a time when she still rented the home. The state prosecuted the trespass case on the theory that defendant knew it was unlawful for him to enter E's house; defendant argued that he had no reason to believe that he could not enter the house during the sale. At trial, a police officer testified that, when he interviewed defendant after the incident, defendant twice asserted that he had "nothing to say." Defendant objected to the officer's testimony, the trial court sustained the objection and struck that testimony, and defendant moved for a mistrial when the officer was done testifying. The trial court denied the motion. On appeal, defendant asserts that the trial court abused its discretion when it denied his mistrial motion. For the reasons set out below, we agree. Accordingly, we reverse and remand.
We review the trial court's decision to deny a mistrial motion for abuse of discretion, keeping in mind that the trial court "is in the best position to assess the impact of the complained-of incident and to select the means (if any) necessary to correct any problem resulting from it." State v. Wright , 323 Or. 8, 12, 913 P.2d 321 (1996). "We will not find the denial of a mistrial to be an abuse of discretion unless the defendant was denied a fair trial." State v. Swanson , 293 Or. App. 562, 565, 429 P.3d 732 (2018).
The facts pertinent to this appeal are not disputed. During her opening statement, the prosecutor said that Police Officer McNeilly had interviewed defendant after the alleged trespass at E's home because McNeilly "wanted to take down [defendant's] statement, wanted to see what happened." She continued:
"What the defendant told the officer was I've got nothing to say. My ex-wife is messing with me. I have nothing to say. Not once did he say this is a mistake-"
Defendant objected. The court sustained the objection and told the prosecutor to "move on." Nonetheless, the prosecutor *46 repeated what defendant had said before she wrapped up her opening statement to the jury: "Thank you. So what [he] told the officer was I've got nothing to say. My wife is messing with me."
Defense counsel's opening statement emphasized that "the element of intent" was the only real question for the jury. She asserted that defendant had no reason to believe that he "wasn't allowed to walk in and buy items from the sale," like "everyone else off the street."
After opening statements, the lawyers presented evidence to the jury establishing that defendant and E married years ago, had children, and divorced a few years before the alleged trespass incident. The children lived with E in a leased house, and defendant had parenting time. According to E, she did not allow defendant in her house.
E left Oregon with the children in February 2016, thinking she might move to New *354 York, but she did not immediately cancel the lease on her Oregon home. Indeed, E had left many of her possessions at that house and, a few days after she left, a friend of hers (Grisa) held a sale at the house (apparently including inside the house) to help E dispose of some belongings. Defendant went to the house that day and spoke with Grisa. At trial, defendant and Grisa gave conflicting accounts of what happened, with defendant essentially testifying that he had no reason to believe that he could not enter the house, like any other member of the public interested in purchasing items for sale, and Grisa essentially testifying that he repeatedly told defendant that he could not enter. Both men agreed, however, that defendant did enter the home, went upstairs, and looked through personal effects that E had left behind. Grisa testified that defendant took items from the house; defendant testified that he did not.
Grisa called the police after defendant left E's house. Officer McNeilly responded to the call, talked with Grisa, and spoke with E by phone. McNeilly testified that he then attempted to locate defendant "[b]ecause *** whenever there's allegations of you know, potential criminal activity *47 we like to find out both sides of the stories because sometimes there's reasonable explanations for things and sometimes there's not." About a week passed before McNeilly found defendant at home one Saturday morning. McNeilly testified that he told defendant that he was following up on an incident at E's house. McNeilly's testimony continued:
"He [defendant] said something along the lines of that his ex-wife was just trying to mess with him, and then I asked if he was at her house. He said I have nothing to say. I said okay. I asked him if he had taken anything from the house. He again told me that he had nothing to say."
Defense counsel objected. The trial court sustained the objection without seeking argument from the parties and ordered, "The last answer is stricken." The prosecutor asked McNeilly whether defendant had elaborated on his statement that E was "messing with him," and the officer responded, "No. That was-that was all I got was that his ex-wife was messing with him." The prosecutor persisted, asking whether there was "any other information [defendant] said about being at the house?" At that point, defense counsel again objected and asked to approach the bench. After a side-bar conversation, the prosecutor asked the officer what he did next, and his testimony continued without further incident, briefly describing his arrest of defendant.
Defense counsel did not immediately move for a mistrial, but instead cross-examined McNeilly on typical subjects like his training on report writing, the content of his report about this incident, what he understood from his conversation with Grisa, and whether McNeilly had located any other witnesses. After McNeilly finished testifying, the prosecutor reported that she had no further witnesses, the jury was excused, and defense counsel then moved for a mistrial:
"The first motion I would make is a Motion for a Mistrial, and [in the prosecutor's] opening she made statements that [defendant] didn't offer any explanation or didn't explain to the officer that all of this was a big mistake and then she elicited the same testimony from this officer that he first said I don't have anything to say to you, and then she elicited further testimony that he didn't offer any additional *48 explanation, and I'd argue that that's an impermissible comment on his right to remain silent."
The court denied the mistrial motion without further discussion. However, the court warned the prosecutor that if she went "anywhere near that"-referencing defendant's assertion that he had "nothing to say"-during closing argument, the court would then grant a mistrial. The prosecutor did not offer any explanation for having elicited and referenced evidence that defendant had expressed a desire not to give a statement to McNeilly.
As noted, defendant assigns error to the trial court's denial of his mistrial motion. Defendant argues that his assertion that he had "nothing to say" to McNeilly was an unequivocal invocation of his right against self-incrimination under Article I, section 12, of the Oregon Constitution. He further contends the state acted impermissibly when it *355 drew the jury's attention to his invocation of that right. Defendant concludes that the comment on his exercise of a constitutional right deprived him of a fair trial and the trial court was, therefore, required to grant his mistrial motion. He requests that we reverse and remand on that basis.
In response, the state focuses on the fact that defense counsel did not move for a mistrial immediately following McNeilly's testimony about defendant's statements, but first cross-examined McNeilly and waited until after the state had rested its case before making that motion. The state argues that the delay made the mistrial motion untimely and, accordingly, defendant did not properly preserve his claim of error for appeal. The state relies on State v. Walton , 311 Or. 223, 248, 809 P.2d 81 (1991), in which the Supreme Court held that, "[t]o preserve error, a motion for a mistrial must be timely." In Walton , the defendant objected to a question and answer that the defendant characterized as suggesting that he had "some burden * * * to come forward * * * with a defense." Id . at 247, 809 P.2d 81. The trial court sustained the objection and struck the testimony. Two additional witnesses testified on other subjects before the defendant eventually moved for a mistrial, which the trial court denied. Id . at 247-48, 809 P.2d 81. On review, the Supreme Court held that the *49 motion was untimely, noting the general rule that a mistrial motion "is timely if it is made when the allegedly objectionable statements were made." Id . at 248, 809 P.2d 81. The state contends that the mistrial motion in this case "was no more timely than the one held to be untimely in Walton ." In reply, defendant points to more recent cases in which we have held that mistrial motions were timely despite not having been made immediately after the remarks or testimony claimed to be objectionable.
Considering the totality of the circumstances, we are unpersuaded by the state's lack-of-preservation argument. Although Walton can be read to articulate a bright-line rule that mistrial motions must be made immediately following any objectionable statements, the court's decision in that case did not depend on the existence of any such rule, as the defendant's request for a mistrial was significantly delayed. And, since Walton , courts have taken a more nuanced approach in determining when mistrial motions are timely and when they are not. In particular, we have emphasized that "[t]he purpose behind requiring an immediate mistrial motion is to allow the court to take prompt curative action if the court believes it is warranted." State v. Veatch , 223 Or. App. 444, 453, 196 P.3d 45 (2008). Accordingly, we have held that a mistrial motion "was timely, even if not instantaneously made, when made under such circumstances that 'the underlying purpose of that preservation requirement is fulfilled.' " State v. Cox , 272 Or. App. 390, 405, 359 P.3d 257 (2015) (quoting Veatch , 223 Or. App. at 454, 196 P.3d 45 ). In assessing timeliness, the appellate courts therefore have considered various factors, including how much time lapsed between the allegedly objectionable comments or testimony, whether additional testimony was heard, whether other issues were discussed, whether the trial court and state knew the defendant objected to the line of questioning, whether the defendant may have made a strategic choice in delaying the mistrial request, and whether the trial court had an opportunity to take prompt curative action. See State v. Larson , 325 Or. 15, 22, 933 P.2d 958 (1997) ; Cox , 272 Or. App. at 406-08, 359 P.3d 257 ; Veatch , 223 Or. App. at 453-54, 196 P.3d 45. We have also taken note when the state "did not *50 object at trial to [a] defendant's motion for a mistrial as untimely." Cox , 272 Or. App. at 408, 359 P.3d 257.
Applying those factors to this case, we conclude that-although the question is close-the underlying purposes of the timeliness requirement were met. Several circumstances, considered together, lead us to that conclusion. First, defendant immediately objected when the state told the jury, in its opening statement, that defendant had told McNeilly that he had "nothing to say" about what happened at E's house. The trial court immediately sustained that objection and told the prosecutor to move on. And defendant promptly objected again when the state, notwithstanding the trial court's earlier ruling, elicited testimony from McNeilly on the same point. This is not a case in which there could *356 have been any question about defendant's position on the admissibility of that testimony.
Second, the trial court not only had an opportunity to take immediate curative action following defendant's objection to McNeilly's testimony, it did so. Without further prompting, the court struck the testimony. This is not a case in which defendant failed to object or in which the defendant objected and the court did nothing other than sustain the objection. Cf . State v. Ysasaga , 146 Or. App. 74, 76, 932 P.2d 1182 (1997) (where the defendant did not object to the problematic evidence, and "waited until cross-examination had finished before moving for a mistrial," that mistrial motion was untimely).
Third, this is not a case in which it is plausible to believe that defendant strategically decided to delay a mistrial motion in hopes that something favorable would happen at trial. Although defendant cross-examined McNeilly before moving for a mistrial, defendant's questions did not seek to elicit testimony of a sort that could have meaningfully undermined the state's case. McNeilly was not a witness to the alleged trespass and, given the particular circumstances of this case, the outcome at trial was unlikely to hinge on any claim that his report was inaccurate or his investigation was flawed. Certainly there may be circumstances in which a defendant hopes that cross-examining a witness will yield such favorable results that the defendant *51 intentionally forgoes a mistrial motion based on earlier statements by the witness, instead hoping for testimony that may prompt an acquittal. See Veatch , 223 Or. App. at 454, 196 P.3d 45 (it may be reasonable in some circumstances "to infer that the defense counsel made a tactical decision to delay making a motion for a mistrial in order to assess how the trial was unfolding and whether it was likely that the jury would return a favorable verdict-in which case, a mistrial would not be desirable"). In such circumstances, a later mistrial motion may well be deemed untimely. Here, however, given the limited scope of McNeilly's testimony and the cross-examination, it is not plausible to think that defendant "was waiting to see how devastating his cross-examination of [the witness] would be to the state's case before deciding whether to make the motion." Id .
Fourth, no other witnesses testified, no other evidence was offered, and no other topics were discussed before defendant moved for a mistrial. Again, no intervening events suggest that defendant might have intentionally delayed moving for a mistrial, hoping that one of those matters might influence the case in his favor. Finally, neither the trial court nor the state expressed a view that defendant's mistrial motion was untimely when made.
Given the totality of those circumstances, we conclude that defendant adequately preserved for appeal his contention that the trial court was required to grant a mistrial based on McNeilly's testimony that defendant had repeatedly stated that he had "nothing to say." We therefore turn to the merits of that question. As explained below, our consideration of "the merits" is limited, as we assume for purposes of this appeal, without deciding, that it was impermissible for the state to elicit and comment on McNeilly's testimony.
Under Article I, section 12, of the Oregon Constitution, "[n]o person shall * * * be compelled in any criminal prosecution to testify against himself." The right to remain silent is derivative of that broader right against compelled self-incrimination. State v. Hickman , 289 Or. App. 602, 606, 410 P.3d 1102 (2017). It is clear from the record that defendant was referencing a right to remain silent when *52 he objected to the state's opening statement and to the evidence that defendant had told McNeilly that he had "nothing to say." As noted, the trial court sustained those objections and the state did not argue below that there was any reason that it could permissibly elicit evidence or comment on defendant's declaration that he did not wish to make a statement to police. In particular, the state did not assert that the Article I, section 12, right to remain silent had not attached because defendant was not in custody or compelling circumstances when he made that declaration. See State v. Schiller-Munneman , 359 Or. 808, 813, 377 P.3d 554 (2016) (Supreme Court has "not addressed *357 whether, absent custody or compelling circumstances, a defendant's invocation of the right to silence in response to police questioning may be admitted as substantive evidence at trial."); State v. Anderson , 285 Or. App. 355, 357, 396 P.3d 984, rev. den. , 362 Or. 94, 405 P.3d 154 (2017) ( Article I, section 12, right to counsel had not attached in "noncompelling circumstances"). Because no argument was made below regarding whether defendant was in custody or compelling circumstances when he said that he had "nothing to say" to McNeilly, and because the trial court deemed the evidence and argument on that topic to be impermissible, we agree with the state that this appeal "presents no opportunity for this court to decide whether in fact that evidence and argument was impermissible under Article I, section 12, of the Oregon Constitution." Accordingly, the remainder of our analysis assumes, without deciding, that the trial court's ruling on that point was correct, that is, that the state impermissibly commented on defendant's invocation of his Article I, section 12, right to remain silent.[1] *53 The remaining question is whether the state's impermissible comment on defendant's invocation of his constitutional right required a mistrial. In that regard, the state points out (1) that the trial court sustained defendant's objections to the prosecutor's opening statement and to McNeilly's testimony and (2) that the jury was instructed to disregard matters to which the court had sustained objections. From those points, the state concludes that the trial court could reasonably conclude that a mistrial was unnecessary because the jury was unlikely to "draw any adverse inference from the fact that defendant had refused to answer the officer's questions."
We disagree. Evidence commenting on a suspect's invocation of the right to remain silent or the right to counsel may require a mistrial "if it raises the impermissible inference that the defendant did so because he * * * was guilty." State v. Hunt , 297 Or. App. 597, 600-01, 442 P.3d 232 (2019). Conversely, when the impermissible reference to an invocation of constitutional rights was made in a context that makes such inferences unlikely, the trial court does not abuse its discretion by denying a mistrial motion. Id . at 601, 442 P.3d 232. Significantly, curative jury instructions will not necessarily negate the need for a mistrial, if the defendant requests one. See id ., 297 Or. App. at 600, 605-06, 442 P.3d 232 (evidence that the defendant said to an officer that "he wanted to talk to [the officer], but did not want to waive his rights," required a mistrial even though the court instructed the jury to disregard the testimony). In determining whether an instruction was sufficiently curative, we consider whether the instruction effectively negated the prejudicial effect of the testimony. State v. Osorno , 264 Or. App. 742, 752-53, 333 P.3d 1163 (2014). At least in some circumstances, an instruction that simply tells the jury to disregard the offending testimony will not be adequate to negate that inference. See id . at 745, 752-53, 333 P.3d 1163 (instruction informing jury that certain testimony was not information that jury could consider and instructing jury to "disregard" that testimony was not effective to cure an officer's testimony that the defendant had said that she did not "want to say anything incriminating"; mistrial was required); see also Hunt , 297 Or. App. at 605-06, 442 P.3d 232 *54 (summarizing decisions on the adequacy or inadequacy of curative jury instructions). *358 Under the circumstances of this case, there was a strong likelihood that the jury would draw an adverse inference from McNeilly's testimony that defendant twice asserted that he had "nothing to say," particularly in light of the prosecutor's reference to that testimony in her opening statement-a reference that she repeated even after the court sustained defendant's objection to it. Defendant's theory at trial was that he believed he was permitted to be in E's house during the sale, like any other member of the public. The jury could find that theory less viable if it knew that, when McNeilly asked defendant whether he had been at E's house, defendant did not give that explanation for having been there, but instead refused to answer the officer's question. Under the circumstances, defendant's silence raised the inference that he was guilty. Indeed, even after the trial court sustained defendant's objection to the evidence, the prosecutor still asked, again, whether defendant had said anything else "about being at the house." That repeated emphasis on defendant's refusal to explain his presence at E's home created a significant risk that the jury would draw an adverse inference of guilt from defendant's invocation of his right to remain silent.
Moreover, the trial court's instruction to the jury did not negate the prejudice created by that inference. Here, the trial court simply sustained defendant's objection to McNeilly's testimony about what defendant had said and ordered that McNeilly's answer to the prosecutor's question be stricken. Having considered the challenged evidence about defendant's statements in context, together with defendant's objections to that evidence and the trial court's responses and instructions to the jury, we conclude that the instruction would not have effectively "unrung the bell" that rang when the state elicited evidence that defendant declined to answer McNeilly's questions about why he had been at E's house. See Hunt , 297 Or. App. at 607-08, 442 P.3d 232 (instruction for jury to "disregard" a question and answer and "not consider it" was insufficient); Osorno , 264 Or. App. at 752-53, 333 P.3d 1163 (instruction to "disregard" offending testimony was insufficient);
*55 Veatch , 223 Or. App. at 461, 196 P.3d 45 (instruction informing jury specifically to ignore references to the defendant's request to speak to a lawyer and not to draw inferences from that evidence was insufficient because it still did "not negate the inference that the person chose to exercise the right because he was conscious of his guilt").
Reversed and remanded.

We have taken a similar approach in other recent cases in which the parties appear to have litigated motions based on a shared assumption that the defendants' Article I, section 12, rights had attached, despite not having addressed on the record whether those defendants were in custody or compelling circumstances when questioned by police. See, e.g. , State v. Dodge , 297 Or. App. 30, 44-45, 441 P.3d 599 (2019) (declining to address whether the defendant was in compelling circumstances when questioned because that argument had not been made below and was not fully developed on appeal); Swanson , 293 Or. App. at 565, 565 n. 1, 429 P.3d 732 (noting that the "trial court's ruling and the parties' arguments at trial and on appeal all assume that the trooper's testimony-that defendant initially refused to speak with the trooper without her attorney's advice-was a comment on defendant's invocation of a constitutionally protected right" and expressing "no opinion as to whether defendant's constitutional right to counsel *** had attached when the trooper questioned her" because the state did not dispute that point in the trial court and the record might have developed differently if it had).