376 June 26, 2024 No. 422

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL LEE NOLEN,
*Defendant-Appellant.*

Yamhill County Circuit Court
20CR38689; A178697

Jennifer K. Chapman, Judge.

Argued and submitted April 3, 2024.

Zachary J. Stern argued the cause for appellant. Also on the briefs was Zachary J. Stern, PC.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Defendant appeals from a judgment of conviction for six counts of first-degree sexual abuse, raising three assignments of error. In defendant's first assignment of error, he argues that the trial court erred in denying his motion to suppress statements that he made during an interview with detectives because the detectives questioned him in compelling circumstances without providing *Miranda* warnings, in violation of Article I, section 12, of the Oregon Constitution. In his second and third assignments of error, defendant argues that the trial court erred in denying defendant's two separate motions for a mistrial.

We conclude that the circumstances of the interview were not compelling, and thus the trial court correctly denied defendant's motion to suppress. As to defendant's first motion for a mistrial, we conclude that it was untimely and thus any error was unpreserved. With respect to defendant's second motion for a mistrial, we conclude that defendant was not denied a fair trial, and thus the trial court did not abuse its discretion in denying defendant's motion. Accordingly, we affirm.

*Motion to suppress:* "We state the facts consistently with the trial court's factual findings that are supported by sufficient evidence in the record and its decision in denying defendant's motion to suppress." *State v. Heise-Fay*, 274 Or App 196, 198, 360 P3d 615 (2015). Detective Steele went to defendant's house to investigate sexual abuse allegations that defendant's 10-year-old granddaughter, A, had made against defendant. Steele arrived at defendant's property in an unmarked car with another detective, Lavish, along with two uniformed patrol deputies who arrived in a marked patrol car. Steele and Lavish parked in defendant's driveway, about 25 feet from the house. The deputies parked their patrol car in the driveway near where the driveway met the road, partially blocking egress and ingress, about 45 yards from the house.[1]

---

[1] The trial court found that the patrol car "would have made it difficult for anyone to leave the property by car, but the driveway/entry was not entirely blocked."

Steele and Lavish, who were not in uniform but had badges sewn onto their polo shirts, approached defendant's front door, with the deputies about ten paces behind them. Steele knocked on the door and defendant answered, holding a small barking dog in his arms. Steele introduced himself and Lavish, told defendant they were conducting an investigation, and asked him if he would be willing to speak with them. After suggesting that they talk outside because of the barking dog, defendant put the dog in the house and walked with the detectives to a picnic table on the side of the house. The patrol deputies walked back down the driveway and stood near their patrol car.

Steele and defendant sat on the same side of the picnic table, straddling the bench, facing each other, and Lavish sat in the middle of the bench on the opposite side. Defendant saw Steele's gun under his jacket. Defendant was facing in the general direction of the driveway and would have been able to see the patrol deputies. Roughly halfway through the interview, which lasted about 74 minutes, the deputies left when one of the detectives signaled to the them that they could leave.

Steele conducted most of the interview, and Lavish's main role was to take notes. Steele began the interview by telling defendant that they were going to talk about an uncomfortable topic about A and "things that had happened between the two of them." Steele told defendant that he would "not [be] leaving with [them] that day, that [they] just needed to talk to him and get his side of the story." Steele said that A had decided to talk about some "dark secrets" and that A had talked about defendant putting his mouth on her breasts. Defendant said he did not remember doing that. Steele responded that that "just didn't seem like an appropriate answer because that's not something you just wouldn't remember." Steele told defendant that "[t]he correct response would be I didn't do that or I did do that. *** I don't remember doesn't seem appropriate. So how about we talk about this a little more and see what you do remember or what you, you know, are willing to talk about today." At some point Steele asked defendant if he suffers from post-traumatic stress disorder due to his military service;

about his drug and alcohol use; and about pornography. Throughout the interview, Steele and Lavish were respectful in tone towards defendant and never yelled or raised their voices.

About 15 minutes into the interview, defendant asked Steele if it would be okay for him to get a drink of water, and Steele said yes but that he would have to follow him into the house. Defendant went into the house through the front door, and Steele came in behind him and stood in the entryway a few steps inside the house. Steele told defendant that he knew that defendant had weapons and asked him where they were, and defendant pointed towards the bedroom. Defendant went into the kitchen and got a glass of water while Steele waited in the entryway, and then they went back out to the picnic table.

About an hour into the interview, defendant made incriminating statements. Steele asked him if it would be okay if he started recording and if they could do a recap of everything they had talked about. Defendant said that was "fine." Steele began recording, read defendant his *Miranda* warnings, and continued to record the rest of the interview, which lasted about 14 minutes.

The state indicted defendant for sexual abuse crimes relating to A. Before trial, defendant moved to suppress the statements he made during the interview, arguing that the detectives had violated his Article I, section 12, right by questioning him in compelling circumstances without first advising him of his *Miranda* rights.[2] The court denied the motion, concluding in a lengthy letter opinion that "the totality of the circumstances under which [defendant] was questioned do not amount to compelling circumstances." On appeal, defendant assigns error to the trial court's denial of that motion. We review the trial court's denial of the motion to suppress for legal error, *Heise-Fay*, 274 Or App at 201, and because we conclude that the circumstances were not compelling, we affirm.

---

[2] Defendant also argued that the detectives had violated his rights under the Fifth and Fourteenth Amendments of the United States Constitution, but on appeal he does not renew that argument.

To protect a person's right against compelled self-incrimination under Article I, section 12 of the Oregon Constitution, officers must give *Miranda* warnings when a person is in custody or in "circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007) (internal quotation marks and citations omitted). Compelling circumstances exist when "a reasonable person in the suspect's position would have felt compelled to answer a police officer's questions." *State v. Bush*, 203 Or App 605, 610, 126 P3d 705 (2006). We consider several nonexclusive factors in making that determination, including (1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter. *State v. Roble-Baker*, 340 Or 631, 640-41, 136 P3d 22 (2006). Rather than apply those factors mechanically, we consider the totality of the circumstances to determine "whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 641.

Considering the factors under the totality of the circumstances and using past cases as helpful guidance, we conclude that defendant was not in compelling circumstances. With respect to the location of the interview, defendant acknowledges that generally, when an interview occurs in a familiar location, such as the defendant's residence in this case, that "diminishes the police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Shaff*, 343 Or at 646; *see also State v. Turnidge (S059155)*, 359 Or 364, 402, 374 P3d 853 (2016), *cert den*, 580 US 1070 (2017) (the fact that the defendant's encounter with officers occurred "at or within close proximity to his home, a place familiar to him[,] *** reduces significantly the likelihood that the circumstances were inherently compelling"); *State v. Nelson*, 285 Or App 345, 352-53, 397 P3d 536 (2017) (discussion in the familiar setting of the defendant's driveway suggested circumstances were not compelling).

The presence of the two patrol deputies and the marked car in defendant's driveway counteracts to some extent the premise that, because the encounter occurred at

defendant's home, the circumstances were inherently less compelling. The police presence here, however, is not as robust as in cases where we have found that a police presence in a residential location contributed to a finding of compelling circumstances. *See, e.g., Heise-Fay*, 274 Or App at 198, 203 (police presence tended to establish police-dominated atmosphere where three police officers, two parole officers, one K-9 deputy and his police dog, and two DHS workers arrived at the defendant's residence in four vehicles, three of which were parked in the defendant's driveway, and the officers had "triangulated" the house, approaching from both the front and back of the house). The location—a picnic table outside of defendant's home, which defendant suggested, with two uniformed officers and a patrol car at a distance—does reduce, to some extent, the likelihood that the circumstances were inherently compelling. Further, the uniformed officers left about halfway through the interview, before defendant made any incriminating statements.

Turning to the second factor—the length of the encounter—the detectives interviewed defendant for just over an hour. That length of time does not by itself suggest that the circumstances were compelling. *State v. Revette*, 318 Or App 749, 760, 508 P3d 985, *rev den*, 370 Or 214 (2022) (interview of "a little over an hour" did not "lend itself towards a finding of compelling circumstances"); *State v. Northcutt*, 246 Or App 239, 241-42, 268 P3d 154 (2011) (no compelling circumstances where "questioning lasted approximately one and one-half hours"). Additionally, under this factor we consider conditions such as whether the defendant was subjected to extreme temperatures or was tired. *See, e.g., State v. Ford*, 244 Or App 289, 295, 260 P3d 637, *adh'd to as modified on recons*, 245 Or App 500, 263 P3d 1110 (2011) (one factor contributing to a finding of compelling circumstances was that, "although the duration of the encounter—one hour—does not, by itself, suggest that the circumstances were compelling, defendant was subjected to the cold weather during most of that time"); *State v. Machain*, 233 Or App 65, 75, 225 P3d 75 (2009) (circumstances were compelling where, among other factors, the defendant's two and one-half hour-long interview was her third in less than 24 hours, she appeared tired, and, early in the interview,

she stated that she felt tired). None of those conditions were present.

As to the third factor—whether the detectives exerted pressure on defendant—the detectives did exert some pressure on defendant by telling him that they were there to talk about "things that had happened between [defendant and A]" and that defendant's response that he did not remember anything was insufficient and he should either admit or deny the conduct.[3] In defendant's view, those interrogation techniques were coercive and aggressive because they were predicated on an assumption of defendant's guilt and calculated to undermine defendant's assertions of innocence. *See Northcutt*, 246 Or App at 250 ("[T]he gravamen of the third *Roble-Baker* factor is the use of aggressive and coercive police interrogation practices, especially including, but not limited to, those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence.").

We agree that Steele's statement that they were there to talk about "things that had happened" between defendant and A was an implicit assumption of defendant's guilt. Further, Steele's response to defendant—that defendant's answer of "I don't remember" was inappropriate and that defendant should admit or deny the conduct—had coercive overtones. Those statements, however, are less coercive and problematic than statements in cases where we have found compelling circumstances. *See, e.g., Roble-Baker*, 340 Or at 643 (circumstances became compelling when detective, after telling the defendant that "'it was real important to tell [the detectives] why she had killed her husband,'" pressured the defendant to admit her guilt by asking, "'Did he deserve that?'"); *Ford*, 244 Or App at 293 (compelling circumstances existed where, among other factors, officer "told defendant 'five or six times' that 'we knew what was going on, we'd been talking to the [alleged victim], we knew, so I needed him to tell me the truth'").

---

[3] Defendant also argues that Steele exerted pressure on defendant by making an emotional appeal, noting that the trial court found that "Steele stated that it was important to put [A's] needs before [defendant's] own needs." There is no evidence in the record, however, to support that finding.

Also, contrary to defendant's assertion that Steele "repeatedly pressed defendant to be honest," there is no evidence in the record to support that assertion, nor is there evidence that the detectives accused defendant of lying. *Cf. Machain*, 233 Or App at 75-76 (finding compelling circumstances in part because detectives "repeatedly told defendant * * * that they knew she was lying, and that she needed to tell the truth and 'be honest now'"). And although, as defendant points out, the detectives "delv[ed] into personal topics" such as pornography and substance use, there is no evidence in the record that those questions were accusatory.[4] *See, e.g., State v. Grimm*, 290 Or App 173, 183-84, 414 P3d 435, *rev den*, 363 Or 283 (2018) (compelling circumstances existed in part because the officer asked the defendant about his pornography habits and suggested that the defendant had a "sexual addiction problem" that played a role in the charged offense).

Further, the detectives did not confront defendant with evidence of probable cause to arrest or imply to defendant that he was subject to arrest if he did not cooperate. *See, e.g., State v. Stone*, 269 Or App 745, 753, 346 P3d 595 (2015) (citing cases where the defendant had been placed in compelling circumstances because "the officers had communicated that they believed each defendant had committed a crime, that they had probable cause to arrest, and that they intended to make an arrest or were strongly weighing the possibility of making an arrest"); *Heise-Fay*, 274 Or App at 207 (officer's statement to the defendant that he had no intention of arresting her if she was honest and cooperative "conveyed to defendant, and would have conveyed to a reasonable person, that, if she was not 'honest and cooperative,' she was subject to arrest"). We also note that the detectives' demeanor with defendant was respectful and calm throughout the interview.

Under those circumstances, then, although the detectives exerted some pressure on defendant, the third factor does not by itself compel a conclusion that the defendant was questioned in compelling circumstances. *See State v. Courville*, 276 Or App 672, 678-79, 368 P3d 838 (2016)

---

[4] It appears from the record that, after defendant admitted to "kiss[ing] [A's] breasts," Steele asked defendant if he had watched pornography with A while the abuse occurred.

(no compelling circumstances where officer indicated to the defendant that he believed that the victim was being truthful; kept encouraging the defendant to talk about allegations after the defendant did not respond to the officer's questions or changed the topic; stated several times that the defendant needed to confess for the victim's benefit; and "made other statements that assumed [the] defendant's guilt").

Turning to the fourth *Roble-Baker* factor—whether defendant was able to terminate the interview—the trial court made an express finding that "if defendant did \*\*\* communicate in some way that he no longer was willing to talk to the officers, it would have been honored." Contending that that finding is legally erroneous, defendant argues that he was not free to leave or terminate the encounter, as evidenced by the patrol car partially blocking the driveway with two officers standing nearby; Steele's insistence that he accompany defendant inside when he got a drink of water; and the fact that the detectives never told defendant he was free to end the interview.

We conclude that the evidence in the record supports the trial court's finding. First, there were no practical barriers to defendant terminating the encounter. Defendant was at home, and although the patrol car was partially blocking the driveway for part of the interview, that would not have prevented defendant from walking inside his house and ending the encounter. *See, e.g., Roble-Baker*, 340 Or at 642 (detectives had created a situation in which defendant was essentially prevented from leaving police headquarters until officers brought her minor child to her); *State v. Reed*, 371 Or 478, 489, 538 P3d 195 (2023) (during the interrogation defendant was attending a mandatory meeting with her probation officer, and "[a]s a legal matter, [defendant] could not leave without his permission," and "one of the police officers stood in the office's doorway"); *Ford*, 244 Or App at 293 (during traffic stop the defendant was not free to leave until he had been cited and his license was returned to him).

Second, as to Steele's insistence that he accompany defendant to get a drink of water, a reasonable factfinder could conclude that that did not signify to defendant that he was unable to terminate the interview. Defendant's request

for water was not an attempt to end the interview, and Steele's question about defendant's guns indicated to defendant that Steele followed him for safety reasons.

Third, this is not a case where defendant attempted to leave or terminate the encounter and the officers did not honor that attempt. *See, e.g., Roble-Baker*, 340 Or at 642 (compelling circumstances existed where, among other factors, the detective did not honor the defendant's request to end the interview). Under the fourth factor, then, there is sufficient evidence in the record to support the trial court's finding that defendant was free to terminate the interview.

In sum, although there were two uniformed deputies who remained at a distance, and their car partially blocked the driveway; the detectives did exert some pressure on defendant during questioning; and Steele accompanied defendant inside the house, those circumstances, considered together do not rise to the level of "compelling circumstances." Because the interview took place at defendant's choice of location outside of his home rather than a police-controlled environment such as a police station; the detectives did not accuse defendant of lying, confront defendant with probable cause to arrest, or suggest that defendant was subject to arrest if he did not cooperate; the detectives were respectful and calm during the encounter; and defendant was free to terminate the encounter, we conclude that defendant was not subjected to "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. Thus, the trial court did not err in denying defendant's motion to suppress.

*Motion for mistrial based on other acts evidence:* In defendant's second assignment of error, he contends that the trial court erred in denying his motion for a mistrial after the state introduced evidence of other, uncharged acts against A. Under the totality of the circumstances, we conclude that defendant's motion was untimely. *See State v. Walton*, 311 Or 223, 248, 809 P2d 81 (1991) ("To preserve error, a motion for a mistrial must be timely.").

A motion for a mistrial is timely when it is "made when the allegedly objectionable statements" or evidence is

presented to the jury. *Id.* "The purpose behind requiring an immediate mistrial motion is to allow the court to take prompt curative action if the court believes it is warranted." *State v. Veatch*, 223 Or App 444, 453, 196 P3d 45 (2008). A mistrial motion may be timely "even if not instantaneously made, when made under such circumstances that the underlying purpose of [the] preservation requirement is fulfilled." *State v. Sprow*, 298 Or App 44, 49, 445 P3d 351 (2019) (internal quotation marks and citation omitted).

In assessing the timeliness of a mistrial motion, we consider "how much time lapsed between the allegedly objectionable comments or testimony, whether additional testimony was heard, whether other issues were discussed, whether the trial court and state knew the defendant objected to the line of questioning, whether the defendant may have made a strategic choice in delaying the mistrial request, and whether the trial court had an opportunity to take prompt curative action." *Id.*

Here, the other acts evidence that defendant based his motion on was A's testimony about an incident of abuse that was not charged in the indictment. Defendant did not object to that testimony, and on cross-examination he asked A additional questions about that uncharged incident. The state then called an additional witness to testify, and it was only after that witness testified and the court took a recess that defendant moved for a mistrial.

Under those circumstances, defendant's motion was untimely and thus any error was unpreserved. Had defendant objected contemporaneously to the testimony, the court and the parties would have been in a better position to efficiently remedy any error. *See State v. Quebrado*, 372 Or 301, 313, ___ P3d ___ (2024) ("One pragmatic touchstone of preservation in the context of a motion for mistrial is whether the parties and the trial court would have been in a superior position to cure the deficiency if the motion had been raised earlier in the proceedings."); *Shields v. Campbell*, 277 Or 71, 77-78, 559 P2d 1275 (1977) (preservation promotes "an efficient administration of justice and the saving of judicial time").[5] Defendant

_____

[5] At trial, neither the state nor the court raised the issue of timeliness. *See Quebrado*, 372 Or at 315 (one factor in assessing preservation is whether the

does not request plain error review. Accordingly, we decline to review defendant's claim of error. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule[.]").

*Motion for a mistrial based on prosecutor's question:* In defendant's third assignment of error, he argues that the trial court erred in denying his motion for a mistrial after the prosecutor asked a question that, in defendant's view, amounted to an improper comment on defendant's exercise of the privilege against self-incrimination. We conclude that the prosecutor's question did not invite an adverse inference that defendant invoked his right to silence and that he did so because he was guilty. Thus, the trial court did not err in denying the motion.

After the state indicted defendant for sexual abuse crimes against A, it amended the indictment to include charges relating to another granddaughter, S, after S made disclosures that defendant had abused her. At trial, the prosecutor asked the lead detective when he became aware of S's allegations and what steps he took to investigate the allegations. The prosecutor then said, "Okay *** this is a yes or no question, okay? So did you make any—did you make efforts to interview the defendant regarding [S's] allegations?" Before the witness answered, defendant objected and moved for a mistrial, arguing that the question was "a gross violation of his right *** to have no commentary on his silence." The court deferred its ruling. The court noted that it would instruct the jury that it was not to speculate as to what any answer would have been, and invited defendant to have the question stricken, which defendant declined. The following day the trial court denied the motion for a mistrial, noting that the witness had not answered the question and reasoning that asking the question did not by itself justify a mistrial because "[h]ere we do not have a direct comment on defendant's constitutional rights *** [and] I don't find that

---

parties or the trial court raised the issue of timeliness). That factor is not dispositive here because, as discussed above, the underlying policies of preservation are not fulfilled.

we even have an indirect comment on constitutional rights given the context of the testimony."

Defendant assigns error to that denial, renewing his argument that the prosecutor's question amounted to a "comment[ ] on defendant's exercise of the privilege against self-incrimination." In defendant's view, because he had made recorded statements about A's allegations—which the jury had heard—but he had not made any statements about S's allegations, the jury would infer from the prosecutor's question that "defendant invoked his right to silence and must be guilty."

We review the denial of the motion for mistrial for abuse of discretion, *State v. Soprych*, 318 Or App 306, 307, 507 P3d 276 (2022), and conclude that, because the prosecutor's question was not so improper as to deny defendant a fair trial, the trial court did not abuse its discretion. *See State v. Swanson*, 293 Or App 562, 565, 429 P3d 732 (2018) ("We will not find the denial of a mistrial to be an abuse of discretion unless the defendant was denied a fair trial.").

In reaching that conclusion, we note that the witness did not answer the question and, given the context of the prosecutor asking the detective about his efforts to investigate, it is unlikely that the prosecutor's question by itself raised inferences that (1) defendant invoked his right to remain silent, and (2) that he did so because he was guilty. *See Sprow*, 298 Or App at 53 ("Evidence commenting on a suspect's invocation of the right to remain silent *** may require a mistrial if it raises the impermissible inference that the defendant did so because he was guilty. *** [W]hen the impermissible reference *** was made in a context that makes such inferences unlikely, the trial court does not abuse its discretion by denying a mistrial motion." (Internal quotation marks and citation omitted.)). Accordingly, the trial court acted within its discretion in denying defendant's motion for a mistrial.

Affirmed.